IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 10, 2002

## STATE OF TENNESSEE V. STOKELY J. U. WAY

**Direct Appeal from the Circuit Court for Cocke County**
**No. 8224     Ben W. Hooper, II, Judge**

---

**No. E2002-00251-CCA-R3-CD**
**February 9, 2004**

---

The Cocke County grand jury indicted the defendant, Stokely J. U. Way, with six counts of rape and six counts of incest. His trial was held on July 31 and August 1 of 2001. The jury convicted the defendant of two counts of rape and two counts of incest. The trial court sentenced the defendant as a Range I Standard Offender to twelve (12) years on each rape conviction, to run concurrently, and three (3) years for each incest count to run concurrently to each other, but consecutively to the rape sentences. However, because there were multiple rape convictions, the defendant's release eligibility for the rape convictions is 100%. The trial court levied the full fines recommended by the jury of $50,000 for the rape convictions and $20,000 for the incest convictions. The defendant brings five issues on appeal: (1) whether the trial court erred in allowing the hearsay testimony of the victim's friend, Mary Ann Breeden, as to what the victim told her regarding her father's incestuous relationship with her; (2) whether the trial court erred by allowing the defendant's preacher to testify about communications between him and the defendant in violation of the clergy/parishioner privilege; (3)whether the evidence was insufficient to establish the offenses of incest or rape and more specifically, the element of force or coercion; (4) whether the trial court erred in not charging all applicable lesser-included offenses including assault, sexual battery, attempted rape, attempted incest and child abuse; and (5) whether the sentences and fines imposed by the trial court were excessive. We affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which GARY R. WADE, P.J., concurred in results and JAMES CURWOOD WITT, JR., J., concurred in part, dissented in part.

Edward C. Miller, Public Defender, Dandridge, Tennessee, for the appellant, Stokely J. U. Way.

Paul G. Summers, Attorney General & Reporter; Kathy D. Aslinger, Assistant Attorney General; and Al Schmutzer, Jr., District Attorney General; and Ronald C. Newcomb, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

The defendant and the victim's mother divorced in 1983. The victim, who was an infant at the time of the divorce, is the defendant's daughter. She did not see the defendant again until she was nine (9) years old. In 1995, when the victim was thirteen (13) years old, the victim's mother was going through a troublesome divorce. At this time, the victim moved to Tennessee to live with the defendant during the school year. She returned most summers to live with her mother in Washington state.

By all outward appearances, when she moved to the defendant's house, the defendant and the victim initially had a very normal, loving father/daughter relationship. The defendant enrolled the victim in school and got her involved in a church community. The defendant had another daughter from a different relationship who was several years younger than the victim. The younger daughter lived with the defendant and the victim on the weekends.

However, in August of 1995, shortly after the victim moved to live with the defendant, she and her father were watching a movie with explicit sex scenes. The victim asked the defendant what the people in the movie were doing. The defendant then took the victim into the bedroom. When they got into the bedroom, the defendant asked her if she trusted him. She said she did. He then told her to take off all of her clothes. He again asked her if she trusted him. After she answered yes, he had her lie on the bed and inserted the handle of a brush inside her vagina. He then asked the victim if she was alright and if she trusted him. She again said yes. The defendant then inserted his fingers inside of her vagina. He again asked her if she was alright and if she trusted him. She again said yes. The defendant then took off his clothes and proceeded to have intercourse with the victim until he ejaculated.

The victim lived with the defendant until she graduated from high school in June of 2000. From August of 1995 until June of 2000, the victim and the defendant had sexual relations on a continuous basis. The defendant became very jealous of any relationships the victim had with boys, and he even refused to keep a copy of her picture from prom because there was a boy in the picture. He punished her for various offenses by taking her car away or depriving her of sleep. She engaged in sexual relations with him to end her punishment.

The victim did not seek help or press charges while she lived with the defendant. She did tell one friend and a sister who lived in Washington state about her relationship with the defendant. Her mother came to her graduation in the Spring of 2000. At the graduation, the victim introduced her mother to her boyfriend. When someone introduced the defendant to the victim's boyfriend, he grabbed his younger daughter and stormed out of the graduation. The victim's mother became suspicious of the "look" on his face and his reaction when he met the victim's boyfriend. The victim's mother confronted the defendant later that night with her suspicions. He told her that he

was mad because the victim had never told him about a boyfriend. He said that the victim was a liar and was deceitful.

After the victim's mother returned to Washington state, the victim called her and told her mother about the sexual relationship with the defendant. The victim then flew out to Washington a few days later to visit her mother for the summer. After the victim got to Washington, she filed a police report with the police in Washington and got a restraining order.

The Cocke County Sheriff's Department began its investigation of the defendant on June 15, 2000. After interviewing witnesses and taking statements, a detective swore out arrest warrants on the defendant. The detective then arrested the defendant at his place of employment. The Grand Jury returned six (6) indictments for rape and six (6) indictments for incest on July 18, 2000. Each indictment was for one count of rape and one count of incest for each year that the victim lived with the defendant. The trial court dismissed two of the indictments for incest for the years 1995 and 1996 for failure to meet the statute of limitations. The trial court held a trial on July 31 and August 1 of 2001. At the conclusion of the trial, the jury found the defendant guilty of two counts of rape, in 1995 and 1996, and two counts of incest, in 1997 and 1998. The jury recommended a fine of $50,000 for the rape convictions and $20,000 for the incest convictions. The trial court sentenced the defendant as a Range I Standard Offender to twelve (12) years on each rape conviction, to run concurrently, and three (3) years for each incest count to run concurrently to each other, but consecutively to the rape sentences. However, because there were multiple rape convictions, the defendant's release eligibility for the rape convictions is 100%. The trial court levied the full fines recommended by the jury.

The defendant now appeals the judgments of the trial court.

## Hearsay Testimony

On appeal, the defendant argues that a statement made by the witness, Mary Ann Breeden, was inadmissible hearsay. The State argues that because the statement was not offered to prove the truth of the matter asserted it was not hearsay and, therefore, admissible.

The following exchange occurred during the State's direct examination of Mary Ann Breeden:

> Q.    At some point in time did [the victim] disclose to you or say to you something to the effect that she had a sexual relationship with her father?
> A.    Yes.
> **Mr. Miller:**    Your Honor, I think I'll make a hearsay objection. I'm not sure that's in the form of fresh complaint, that many years later.

**Gen. Newcomb:** Your Honor, the State is not offering – [the victim] is going to be here to testify later on, Your Honor. The State is offering that as a foundation for my next question regarding a discussion that occurred between Ms. Breeden and [the victim] at the church. I'm not offering it for the proof of the matter, I'm just offering it to lay the foundation.

**The Court:** Objection overruled.

Q. Now, Ms. Breeden, at some point in time after [the victim] had made this statement to you, did you have a conversation with [the defendant] in the church?

A. Yes, sir.

Q. Alright. Tell the Jury about that conversation?

A. Let's see. We sat down to talk. At first he ran out and he came back in and we sat down and talked and I was a little skittish and he said are you scared of me and I just sort of looked at him. And he asked me why and I said well, there's more to the situation than you're letting on and I know about it. And he said well, if we're on the same track then yes, there is. And that's about – I mean we never did go into discussion about what it was but we were on the same level.

Q. Ms. Breeden, just to clarify, you said to [the defendant] there's more to the situation than you're letting on and I know about it?

A. Uh-huh.

Q. And he responded to you well, yes, there is?

A. Yes.

The admissibility of evidence is a matter solely within the discretion of the trial court, and the trial court's ruling will not be disturbed absent a clear showing of an abuse of that discretion. See State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay testimony is not admissible as evidence during a trial. Tenn. R. Evid. 802.

The State argues that the statement in question was not hearsay because it was not offered for the proof of the matter asserted. Rather, the State offered the statement to lay the foundation for the conversation between Ms. Breeden and the defendant.

In State v. Gibson, 973 S.W.2d 231 (Tenn. Crim. App. 1997), we addressed a similar hearsay problem. In Gibson, the victim's mother tape recorded her conversation with the defendant in which the defendant admitted to having sexual relations with her daughter. The defendant objected to the admissibility of the mother's statements on the recording as hearsay. We stated, "[T]he state did not ask the jury to believe what she said on the tapes. The state's primary objective was to bring before the jury the statements made by the defendant." Gibson, 973 S.W.2d at 243 (citing State v. Jones, 598 S.W.2d 209 (Tenn. 1980)). Therefore, we said the statements were not hearsay. The same can be said in the case at hand. The State did not offer the victim's statement to Ms. Breeden to prove that the victim and the defendant were having a sexual relationship, but rather used that statement to bring the defendant's statements concerning his relationship with the victim before the jury.

As stated above, the admission of evidence is in the sole discretion of the trial court. Because we have determined that the statements were not hearsay, we find no abuse of discretion on the part of the trial court. Therefore, this issue is without merit.

## Clergy/Parishioner Privilege

The defendant also argues that the testimony of Reverend Tiger Gullett should not have been allowed at trial. The defendant argues this testimony was not admissible because it falls under the confidential communications privilege for clergy found at Tennessee Code Annotated section 24-1-206(a).

Prior to trial, the State filed a motion to allow admissions made by the defendant to his pastor, Reverend Gullett. The State relied upon Tennessee Code Annotated section 37-1-614 which states that evidentiary privileges are inapplicable to child abuse cases. The trial court held a hearing on this issue and determined that the testimony was admissible due to Tennessee Code Annotated section 37-1-614.

Reverend Gullett testified to the statements that could be considered privileged communication. He testified that he received a telephone call from the defendant when the victim moved out of his house. Reverend Gullett said that the defendant stated in the conversation that he was very upset because "it wasn't as if he had lost his daughter, it was as if he had lost his wife." Reverend Gullett went on to testify that he later found out about the sexual relationship between the defendant and the victim from the victim's mother. He called the defendant and asked if the allegations were true. The defendant responded that they were true. He then told Reverend Gullett that "it wasn't as if he was having a sexual relationship with his daughter, he never knew her as a child so it didn't, it just didn't seem rational to him at that time that it was his actual daughter."

Tennessee Code Annotated section 37-1-614 reads "[t]he privileged quality of communication . . . between any professional person and the professional person's patient or client, and any other privileged communication except that between attorney and client, . . . shall not apply to any situation involving known or suspected child sexual abuse." At Tennessee Code Annotated section 37-1-602(a)(3), child sexual abuse is defined extensively. There are essentially four definitions for the term addressing four different situations. The first two definitions clearly limit the lifting of the privilege to incidents occurring before the victim is thirteen years old and specifically references the criminal offenses commonly charged in such a situation. Tenn. Code Ann. § 37-1-602(a)(3)(A) & (B). The third definition describes various conduct which would be considered by the average layperson to be child sexual abuse without reference to the criminal code. Tenn. Code Ann. § 37-1-602(a)(3)(C).

The State, both at trial and on appeal, relies upon the fourth definition included in Tennessee Code Annotated section 37-1-602(a)(3)(D). Tennessee Code Annotated section 37-1-602(a)(3)(D) states:

For the purposes of the <u>reporting, investigation, and treatment provisions</u> of §§ 37-1-603 –37-1-615 "child sexual abuse" also means the commission of any act specified in subdivisions (a)(2)(A)-(C) against a child thirteen (13) years of age through seventeen (17) years of age if such act is committed against the child by a parent . . ..

Tenn. Code Ann. § 37-1-602(a)(3)(D) (emphasis added).

We do agree that Tennessee Code Annotated section 37-1-614 is included within the statutes referenced in Tennessee Code Annotated section 37-1-602(a)(3)(D). However, when as in the instant case, the situation involves a child between the ages of thirteen (13) and seventeen (17) when the sexual abuse occurs, the limiting language in Tennessee Code Annotated section 37-1-602(a)(3)(D) lifts the clergy/parishioner privilege only in situations where the Department of Human Services is investigating child sexual abuse allegations, and people are reporting such allegations to the authorities, the Department of Children's Services is investigating such allegations, or the Department of Children's Services is seeking treatment for victims following such allegations. In fact, the Department of Children's Services is referenced several times throughout this chapter of the Code, including the enumerated sections under the definition in question. <u>See</u> Tenn. Code Ann. §§ 37-1-102(b)(11), -603, -606, -607, & -611. For these reasons, we find that Tennessee Code Annotated section 37-1-614 is not available in criminal prosecutions as an exception to the evidentiary privilege of communication between a clergyman and his parishioner when the victim is thirteen (13) through seventeen (17) years of age.

A number of decisions in this state have held that Tennessee Code Annotated section 37-1-614 lifts the clergy/parishioner privilege in cases involving otherwise privileged statements given to official investigations of child abuse allegations. See, <u>State v. Smith</u>, 933 S.W.2d 450 (Tenn. 1996); <u>State v. Chesley Randall Thompson</u>, No. 03C01-9807-CC-00238 Tenn. Crim. App. at

Knoxville, Mar. 24, 1999); State v. Reuben Carlton Bowen, Jr., No. 03C01-9108-CR-241 (Tenn. Crim. App. at Knoxville, Jan. 30, 1992). In State v. Donald C. McCary, No. 03C01-9303-CR-00103 (Tenn. Crim. App. at Knoxville, May 11, 1994); a panel of this Court held that the clergy/parishioner privilege did not apply where the defendant made one of his incriminating statements to a clergyman outside of a quest for spiritual counsel or advice, and made another statement to another clergyman from whom the defendant had rejected an offer of spiritual advice and counseling.

The only case squarely on point with the case *sub judice* is State v. Michael D. Keen, No. 01C01-9804-CR-00192, 1999 WL 254384 (Tenn. Crim. App. at Nashville, April, 30, 1999). In Keen, we stated that Tennessee Code Annotated section 37-1-614 (1996) did not apply to lift the evidentiary privilege because the victim was fourteen (14) and, therefore, not a child and that the indictment did not allege child sexual abuse. Michael D. Keen, 1999 WL 254384 at *5, n.4. Our Court had previously established in the opinion that the victim was not a child by definition under Tennessee Code Annotated sections 39-13-504(a)(4) and 39-13-522(a). Michael D. Keen, 1999 WL 254384 at *4. Those statutes provide, as in the first two definitions under Tennessee Code Annotated section 37-1-602(a)(3), that a child is defined as an individual who is under thirteen (13) years of age.

In the case sub judice, the victim was thirteen (13) at the time of her first sexual encounter with her father. The behavior then continued up until the time she was eighteen (18), graduated from high school and moved out of the defendant's house. Therefore, the provisions of Tennessee Code Annotated section 37-1-614 lifting the evidentiary privilege cannot apply to this case under the definitions set out in Tennessee Code Annotated section 37-1-602(a)(3). The privilege also cannot be lifted relying upon Tennessee Code Annotated section 37-1-614 in companion with the commonly accepted criminal code definition of a child in sex crimes.

For these reasons, the trial court erred in allowing Reverend Gullett to testify to defendant's statements on these two occasions at trial. We must now turn to whether the error was harmless. When determining whether such an error is harmless beyond a reasonable doubt, the proper question is "whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial." State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002).

We find that even without Reverend Gullett's testimony, a reasonable jury would still have found the defendant guilty. Although not as direct as Reverend Gullett's testimony, several other people testified to similar evidence concerning the relationship between the defendant and the victim. The victim's mother and the victim's friend both testified to similar statements made by the defendant concerning his relationship with the victim. In addition, there is the testimony of the victim, which is the direct evidence of the relationship. The jury obviously found her to be a credible witness. For these reasons, we find that the absence of Reverend Gullett's testimony would not change the jury's verdict. Therefore, we find that the error was harmless.

## Sufficiency of the Evidence

The defendant also challenges the sufficiency of the evidence to convict him of rape and incest. When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

The State's first witness at trial was Detective Derrick Woods with the Cocke County Sheriff's Department. Detective Woods testified that he received information from the police in Washington state around June 15, 2000. This information led him to take a statement from the victim and from her friend Mary Ann Breeden. He then swore out arrest warrants and took the defendant into custody.

The State then presented the victim's friend, Mary Ann Breeden. Ms. Breeden testified that she and the victim attended church and school together. Ms. Breeden stated that the relationship between the victim and the defendant was more like a husband and wife relationship than a father and daughter relationship. She also testified that the defendant was very jealous of the victim. She told of one incident where the victim went to the prom with her boyfriend, but the defendant would not have a copy of the picture because her boyfriend was in the picture. She also described the defendant as domineering, angry and acting like a jealous husband. On cross-examination, Ms. Breeden testified that she sometimes would spend the night with the victim as many as three nights a week but never saw the victim and the defendant have sexual relations. Sometimes, she stated, the victim's half-sister, Nikki, would also be at the house. She also testified that the victim would try to have boyfriends, but the defendant would get jealous and it would end up in an argument.

The State's next witness was the victim's mother, Kimberly Woods-Carlock. She testified that she and the defendant divorced in 1983. From their divorce until the victim was nine (9) years old, the victim had no contact with the defendant. After the victim turned thirteen (13) in 1995, she

moved to Tennessee to live with the defendant and spent the summers with her mother. The victim did not make any allegations against the defendant until June of 2000.

Ms. Woods-Carlock also testified that she came to Tennessee for the victim's high school graduation. At the graduation, she met the victim's boyfriend. When the defendant met the victim's boyfriend, "the look on his face just made [her] nervous and [her] blood run cold." She saw the defendant turn around and walk out of the graduation with Nikki. When the defendant left the graduation, the victim broke down. The victim and her mother then returned to the mother's hotel. When the defendant brought Nikki to swim at the hotel, the witness confronted the defendant because of his abnormal reaction. The defendant, the victim, and Ms. Woods-Carlock then sat down to discuss the defendant's reaction. He said that he had never met the boyfriend before and that the victim was a liar and deceitful. The witness testified that there was still no disclosure of sexual abuse at this time, but there was plenty of verbal abuse of the victim by the defendant. The family then went to dinner. After dinner, Ms. Woods-Carlock and the defendant had a phone conversation in which he became very abusive to her.

Ms. Woods-Carlock said she spoke to the victim by telephone on June 2. During this phone conversation, the victim told the witness of her sexual relationship with the defendant. When she returned to Washington state, Ms. Woods-Carlock left the victim in the care of another family, but the defendant came and got the victim. The witness then made flight arrangements for the victim to stay with her in Washington state for the summer. After the victim came to Washington state, the defendant called Ms. Woods-Carlock crying. He told Ms. Woods-Carlock that he was sorry. Ms. Woods-Carlock told the defendant that he needed to turn himself in to the police. He told her he "couldn't live like this" and that she should not call him for three days. He would send the victim all the money in his pocket and that he had everything he needed in his car. He then told Ms. Woods-Carlock he would not go to jail, and he hung up the phone. She later spoke with him by phone to make sure that he was still in Tennessee and not coming to her house to take the victim away. When she did, she again urged him to turn himself in to the police, but he told her to talk to his lawyer. She and the victim went to the police in Washington state, filed a police report and got a restraining order against the defendant.

On cross-examination, Ms. Woods-Carlock stated that the defendant did get the victim enrolled in school and involved in church. She also stated that the victim lived with her every summer except for the summer between the ages of thirteen (13) and fourteen (14). She sent the victim to live with the defendant because of her contentious divorce at the time but let her remain with the defendant because of her son's drug problems.

The State's next witness was the defendant's pastor, the Reverend Roy "Tiger" Gullett. We addressed a portion of the pastor's testimony above and held that a portion of Reverend Gullett's testimony was inadmissible at trial. However, his testimony concerning the appellate's admissions can be considered when assessing the sufficiency of the convicting evidence. See, State v. Longstreet, 619 S.W.2d 97, 100-01 (Tenn. 1981). Moreover, his admissible testimony was as follows. At some point when the victim lived with the defendant, her brother was in an accident.

The victim's mother called the pastor and his wife to find the victim and get her to a phone to talk to her mother. The minister and his wife went to get her, and then they went to a tennis court looking for the defendant. Later that evening, Reverend Gullett ran into the defendant. The defendant became very angry with Reverend Gullett, pulled off his shirt, indicating he wanted to fight, and told the Reverend that he had no right going to get the victim. The Reverend apologized, and the two men maintained their friendship. Reverend Gullett stated that the victim cared for the defendant very much, but was also very fearful of him. The Reverend believed that the victim was unstable emotionally. He also believed the defendant's treatment of the victim to be very loving and concerned, but at the same time domineering.

On cross-examination, Reverend Gullett testified that the defendant had been a member of the church before the victim moved to live with him. When asked if the defendant was a good provider, the Reverend replied, "Somewhat, yes." In reference to the argument between the minister and the defendant, the defendant's attorney asked if Reverend Gullett could understand why the defendant would be so upset about another man picking up his daughter without permission. Reverend Gullett replied that he did not understand it because his wife was with him, and they believed that they were acting compassionately.

The State's final witness was the victim. The victim testified that she had "sexual intercourse" with her father, the defendant, for five years, 1995, 1996, 1997, 1998, 1999 and 2000. She testified that the first time they had sexual relations, she and the defendant were watching a movie in August of 1995. The movie had an explicit sex scene in it, and she asked her father what the actors were doing. He then took her into his bedroom and asked her if she trusted him. She said yes, and he told her to take off all her clothes. He again asked her if she trusted him. She replied that she did, and he told her to lie down on the bed. He then took a brush and put the handle inside of her vagina. Once again he asked her if she was okay and if she trusted him. She again said yes, so he digitally penetrated her vagina. He again asked her if she trusted him. She replied that she did. He then took off his clothes and proceeded to get on top of her and have vaginal intercourse until he ejaculated.

The State then asked the victim if she had had "sexual relations" with the defendant on at least one occasion in 1996. She said she did. The State asked the same question for each year from 1996 until 2000. She answered "yes" to each year. She stated that the defendant was very controlling and would often take her car away or ground her. He would yell at her and sometimes deprive her of sleep. At times he would threaten her with violence, such as threatening to knock out her teeth. She said she was afraid of the defendant. She got a job in 1999 to help pay for extra senior year expenses. However, she ended up supporting them after she got her job, because the defendant then quit his job. Her younger half-sister, Nikki, lived with them on the weekends.

Sometimes the defendant was remorseful for having sexual relations with the victim. At those times, the defendant and the victim would go up to the altar at church and pray for forgiveness. But, he continued to have intercourse with the victim. On at least one occasion, while they were having intercourse, the defendant asked the victim "how it felt to have [her] father f—ing her." He

told her that he was in love with her. He said that he wanted to run away with her where no one knew them. Then, because they had the same last name, people would think they were husband and wife. He was often jealous if any boys called, and he stormed out of her graduation after he met her boyfriend.

She never reported their relationship while she lived there. She said that she was scared to report it and wanted to protect her younger half-sister. To punish her he took away her car or deprived her of sleep. She went to him sexually to end the punishment. She took birth control pills during this period.

On cross-examination, the victim testified that she met her father when she was eight (8). The next time she saw him he was living in Florida. She then moved in with him when she was thirteen (13). She stated that her sexual experiences with her father were not painful, and sometimes she had sexual intercourse with him willingly. The defendant never wore condoms, but she never got pregnant, even though she took the pill irregularly. She said that her father did not like her having boyfriends and caused problems for her in that regard. She also stated that her father never physically abused her.

On redirect, the victim testified that she had full sexual intercourse where the defendant would put his penis in her vagina in 1995, 1996, 1997, 1998, 1999 and 2000. She was frightened not to return to the defendant's house after her summers away because she was afraid he would start on her sister or something else bad would happen. She also testified that their family friends, the Bible family, were not with them twenty-four hours a day, seven days a week. This concluded the State's case.

The defendant's main argument on appeal is that the evidence was insufficient to support the defendant's convictions for rape and incest. The defendant specifically relies upon the absence of proof of force or coercion that is required for rape, but not incest. Tennessee Code Annotated section 39-13-501 contains the definition of coercion as it applies to the offense of rape under Tennessee Code Annotated section 39-13-503(a). This section defines coercion as the "threat of kidnapping, extortion, force or violence to be performed immediately or in the future or the use of parental, custodial, or official authority over a child less than fifteen (15) years of age . . . ." Tenn. Code Ann. § 39-13-501(1) (emphasis added). The defendant's rape convictions were for the years that the victim was thirteen (13) and fourteen (14). Therefore, the use of parental authority over a child less than fifteen (15) has been met in this case. The fact that there was no proof of physical abuse or physical force by the defendant to procure sexual intercourse with the victim is irrelevant. There is sufficient evidence to prove coercion from the proof that the victim was thirteen (13) and fourteen (14) when she had sexual intercourse with her father, the defendant.

This issue is without merit.

## Lesser-Included Offenses

The defendant also argues that the trial court erred by not instructing on the lesser-included offenses of assault, sexual battery, attempted rape, attempted incest and child abuse. However, as the State points out in its brief, the defendant does not include the trial court's failure to instruct on sexual battery, attempted rape or attempted incest in his Motion for New Trial, but merely assault and misdemeanor child abuse. The State argues that the defendant has therefore waived an appeal on the trial court's failure to instruct on sexual battery, attempted rape or attempted incest. The State then argues that even though the defendant included assault and sexual battery in his motion for new trial, the trial court's failure to instruct on these offenses is not sufficient to warrant reversal of his conviction.

When reviewing a trial court's failure to instruct on lesser-included offenses, it is a mixed question of law and fact. State v. Marcum, 109 S.W.3d 300, 302 (Tenn. 2003) (citing State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001)). Therefore, we review such questions de novo, with no presumption of correctness. Id.

Our statutes provide:

> It is the duty of all judges charging juries in cases of criminal prosecutions for any felony wherein two (2) or more grades or classes of offense may be included in the indictment, to charge the jury as to all of the law of each offense included in the indictment without any request on the part of the defendant to do so.

Tenn. Code Ann. § 40-18-110(a) (1997).[1] In State v. Ely, 48 S.W.3d 710, 726 (Tenn. 2001), our state supreme court definitively held that this statutory admonition to trial judges enjoyed constitutional stature under Article I, section 6 of the Constitution of Tennessee, guaranteeing the right to trial by jury. The court also noted that section 40-18-110(a) (1997) has been interpreted to mean that the duty to instruct the jury as to a lesser-included offense does not arise unless the evidence is sufficient to support a conviction for the lesser offense. Id. at 718 (citing State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999) (quoting State v. Langford, 994 S.W.2d 126, 128 (Tenn. 1999))).

The test to determine whether an offense is a lesser-included offense of the indicted offense was articulated in the supreme court decision of State v. Burns, 6 S.W.2d 453 (Tenn. 1999). Under the Burns test, an offense is a lesser-included offense of the greater indicted offense if:
(a) all of its statutory elements are included within the statutory elements of the offense charged; or

---

[1] This section was amended in 2001. Tenn. Code Ann. § 40-18-110 (Supp. 2003). However, the compiler's notes to the amended section state that the new section will govern trials "conducted on or after January 1, 2002." Id. Because the defendant's trial was conducted on July 31 and August 1, 2001, the statutory section transcribed above is controlling of the defendant's case.

-12-

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
  (1) a different mental state indicating a lesser kind of culpability; and/or
  (2) a less serious harm or risk of harm to the same person, property or public interest; or
(c) it consists of
  (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
  (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b) ; or
  (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Id. at 466-67.

## Sexual Battery, Attempted Rape and Attempted Incest

As stated above, the State argues that the defendant has waived his appeal related to the trial court's failure to instruct on sexual battery, attempted rape and attempted incest because of his failure to include these issues in his motion for new trial. Our supreme court dealt with a similar issue in State v. Reginald D. Terry, No. W2001-03027-SC-R11-CD, 2003 WL 22455893 (Tenn. Oct. 30, 2003). In Terry, the defendant failed to file a timely motion for a new trial. Therefore he waived his right to appeal on the issue of lesser-included offenses. However, our supreme court held that the defendant could be granted relief if "the failure to instruct constituted plain error." Reginald D. Terry, 2003 WL 22455893, at *4. Therefore, we turn to a plain error analysis.

In order to review an issue under the plain error doctrine, five factors must be present: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. See State v. Adkisson, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994); see also Tenn. R. Crim. P. 52(b).

## Sexual Battery

We must first decide whether sexual battery is indeed a lesser-included offense under the Burns test. Sexual battery has been held to be a lesser-included offense of aggravated rape under the Burns test by our supreme court in State v. Bowles, 52 S.W.3d 69, 76-77 (Tenn. 2001). Sexual battery has also been held to be a lesser-included offense of rape by our Court in State v. Steven Lee Whitehead, No. W2000-01062-CCA-R3-CD, 2001 WL 1042164 (Tenn. Crim. App. at Jackson, Sept. 7, 2001), and State v. Steven Lee Whitehead, No. W2002-00484-CCA-RM-CD, 2002 WL 1426542 (Tenn. Crim. App. at Jackson, Dec. 2, 2002).

-13-

Having found that sexual battery does indeed meet the <u>Burns</u> test as a lesser-included offense, we now turn to whether the trial court should have instructed on sexual battery. In <u>Burns</u>, our supreme court stated a two-part analysis to determine whether a lesser-included offense instruction should be given to jury. Our supreme court stated:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

<u>Burns</u>, 6 S.W.3d at 469.

The elements of sexual battery as pertains to the case <u>sub judice</u> are: (1) unlawful sexual contact between a victim and a defendant; (2) force or coercion is used to accomplish the act; and (3) the defendant acted intentionally, knowingly, or recklessly. Tenn. Code Ann. § 39-13-505(a); <u>see also</u> <u>Steven Lee Whitehead</u>, 2001 WL 1042164 at *20. Coercion in this section means, "the threat of kidnapping, extortion, force or violence to be performed immediately or in the future." Tenn. Code Ann. § 39-13-505(b). Sexual contact means, "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

The elements of rape as relevant to the defendant's conviction are: (1) unlawful sexual penetration by the defendant of a victim or by a victim of the defendant; (2) accomplished by force or coercion; and (3) the defendant acted intentionally, knowingly, or recklessly. Tenn. Code Ann. § 39-13-503(a). The definition for coercion as used in Tennessee Code Annotated section 39-13-503 can be found at Tennessee Code Annotated section 39-13-501. This section defines coercion as the "threat of kidnapping, extortion, force or violence to be performed immediately or in the future or <u>the use of parental, custodial, or official authority over a child less than fifteen (15) years of age</u> . . . ." Tenn. Code Ann. § 39-13-501(1) (emphasis added).

In the <u>Bowles</u> and <u>Whitehead</u> cases, the supreme court and our Court focused on the difference between aggravated rape or rape and sexual battery being the requirement of sexual arousal or gratification as an element of sexual battery but not of aggravated rape or rape. However, there is an additional difference between rape and sexual battery in the case <u>sub judice</u>. The definition of coercion for the two offenses, and that relied upon for the defendant's conviction, are very different. Coercion as used in Tennessee Code Annotated section 39-13-503 includes "<u>the use of parental, custodial, or official authority over a child less than fifteen (15) years of age</u> . . . ." Tenn.

Code Ann. § 39-13-501(1) (emphasis added). However, "coercion" as defined in Tennessee Code Annotated section 39-13-505 does not include this language.

Now we turn to whether there is any evidence that reasonable minds could accept as to proof of sexual battery from the evidence presented at trial. As stated above, the important difference between the elements of rape and sexual battery as pertains to this case is the definition of coercion. At trial, the victim did not testify to any threats "of kidnapping, extortion, force or violence." She testified that the defendant never physically hurt her at any of their encounters. She even testified that sometimes she initiated sexual activity so that she could get out of her punishments. Even when this evidence is taken in a light most favorable to the existence of sexual battery, there is no way reasonable minds could find that this evidence would support a sexual battery conviction.

In addition, the trial court presented the jury with a count of rape for each of the six (6) years the victim lived with the defendant. However, the jury convicted the defendant of the counts of rape for the years that the victim was thirteen (13) and fourteen (14) and rejected the rape indictments for the years the victim was fifteen (15) or older. Clearly, the jury relied upon the definition of coercion connected to the victim being under the age of fifteen (15) to find the defendant guilty of rape. If the jury had found coercion in any other form, they could have convicted the defendant of the additional counts of rape. The jury clearly rejected other forms of coercion or force in its deliberations.

We find that there is no evidence that reasonable minds could rely upon to find the defendant guilty of sexual battery in the case sub judice. Therefore, we do not find plain error in the trial court's failure to instruct on sexual battery. Rather, we find that the trial court had no duty to instruct on the lesser-included offense of sexual battery, because no substantial right of the defendant has been adversely affected. See Adkisson, 899 S.W.2d at 641-43.


Attempted Incest and Attempted Rape

The defendant also argues that the trial court committed reversible error when it did not instruct the jury upon the lesser-included offenses of attempted incest and attempted rape. As stated above, the defendant did not include this issue in his motion for new trial, therefore, the plain error rule must be met for a reversal of the defendant's conviction on this issue.

Attempt crimes are lesser-included offenses under part (c) of the Burns test. "An offense is a lesser-included offense if . . . (c) it consists of . . .(2) an attempt to commit the offense charged." Burns, 6 S.W.3d at 466-67.

As stated above, after determining that an offense is indeed a lesser-included offense, we must then turn to the two-part test set out in Burns to determine whether the trial court should have given the instruction. The two-part test is whether evidence exists so that reasonable minds could

accept the lesser-included offense and then whether the evidence is legally sufficient to support a conviction on the lesser- included offense. Id. at 469.

Our supreme court analyzed the application of the Burns test to part (c) attempt lesser-included offenses in State v. Marcum, 109 S.W.3d 300 (Tenn. 2003). The trial court in Marcum convicted the defendant of rape of a child, aggravated sexual battery and incest. On appeal, the defendant argued that the trial court's failure to instruct on attempted rape was reversible error. Marcum, 109 S.W.3d at 301. The supreme court held that there were two ways to interpret the evidence at trial. Either there was evidence that there was a completed crime or evidence that there was not a crime at all. Id. at 304. Because there was no evidence of attempt, the supreme court held that an instruction on attempt was not required. Id. In other words, an instruction on a lesser-included offense is not triggered under part (c) of the Burns test unless a reasonable juror might have found that the defendant was guilty only of attempt as opposed to the completed crime.

We now turn to the elements of rape, incest and attempt. Rape, as relevant to this case, is "the unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by the following circumstances . . . [f]orce or coercion is used to accomplish the act . . . ." Tenn. Code Ann. § 39-13-503(a)(1). Incest is "engag[ing] in sexual penetration as defined in § 39-13-501, with a person, knowing such person to be, without regard to legitimacy . . .[t]he person's natural . . . child . . . ." Tenn. Code Ann. § 39-15-302. Sexual penetration is defined as, "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required . . . ." Tenn. Code Ann. § 39-13-501(7). Criminal attempt is found at Tennessee Code Annotated section 39-12-101, which states:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
> (b) conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

There was no evidence presented at trial to support a conviction for attempted rape or attempted incest. At trial, the only evidence presented as to the specific details of the encounters between the victim and the defendant was the victim's testimony. The victim testified to having sexual relations with her father. She then testified to having sexual intercourse with him upon re-

direct examination. There was additional testimony from the victim's mother and her friend stating that they heard of the "abuse" or "sexual relationship" from the defendant and the victim. However, the direct evidence as to the encounters clearly includes evidence of actual penetration. Therefore, there is no evidence from which a jury could find the defendant guilty of only attempted rape or attempted incest. As in Marcum, the jury was left with two interpretations. Either the victim was a credible witness and the defendant had sexual intercourse with her, or she was not credible and he did not have intercourse with her. The testimony by the victim's mother and her friend merely support the victim's testimony but are not enough in themselves to support an attempt conviction. Therefore, a reasonable jury could not find sufficient evidence to support convictions for attempted rape or attempted incest. We therefore decline to find plain error with respect to a failure to instruct the jury with respect to attempted rape or attempted incest. This issue is waived.

### Child Abuse

The defendant did include the absence of an instruction on the lesser offense of child abuse as a ground in his motion for new trial. Therefore, we must analyze this issue under Burns without having to meet the plain error rule. Under Tennessee Code Annotated section 39-15-401(d), child abuse can be "a lesser included offense of any kind of . . . sexual offense if the victim is a child and the evidence supports a charge under this section."

We now turn to whether a reasonable jury could find evidence of child abuse under these facts. Child abuse is when "[a]ny person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury . . . ." Tenn. Code Ann. § 39-15-401(a). Bodily injury is defined as, "a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty . . . ." Tenn. Code Ann. § 39-11-106(a)(2). Upon cross-examination, the victim testified that her sexual experiences with her father were never a painful experience physically. There is no evidence that any of the victim's mental faculties were impaired. The victim also agreed that her father never "laid a hand on [her] as far as physical abuse, slapping, hitting, black eyes, anything like that." This evidence is not enough for a reasonable juror to support a finding of child abuse. There is no testimony that the defendant ever injured the victim. Therefore, we find that there was no error in the trial court's failure to instruct on child abuse.

### Assault

The defendant particularly argues that the jury should have been instructed on Class B misdemeanor assault found at Tennessee Code Annotated section 39-13-101(a)(3). Assault under Tennessee Code Annotated section 39-13-101(a)(3) is defined as "intentionally or knowingly caus[ing] physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." This Court has held that Class B misdemeanor assault is indeed a lesser-included offense of rape. State v. Haskel D. Finch, No. M2001-00340-CCA-R3-CD, 2002 WL 1204931, at *15 (Tenn. Crim. App. at Nashville, June 5, 2002).

We now turn to whether the trial court should have given the instruction. We first must determine if there is any evidence that a reasonable jury could accept to prove assault. The victim's testimony clearly would suffice to prove assault to a reasonable jury. The defendant knowingly caused physical contact that a reasonable person would consider extremely offensive or provocative. We also determine that the evidence is legally sufficient to support a conviction for assault. Therefore, the trial court erred in not instructing on Class B misdemeanor assault.

The State concedes that the trial court erred in not giving this instruction. However, this is not the end of the inquiry. We must now determine whether this error is harmless beyond a reasonable doubt. Ely, 48 S.W.3d at 727. When determining whether such an error is harmless beyond a reasonable doubt, the proper question is "whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial." State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002).

In State v. Michael Elvis Green, No. W2001-00455-CCA-R3-CD, 2002 WL 1482680 (Tenn. Crim. App. at Jackson, Mar. 8, 2002), we were faced with an almost identical situation. In Green, there was definitive evidence of penetration, but no evidence of mere contact. We held that it was harmless error for the trial court to not instruct on Class B misdemeanor assault because there was no evidence that defendant's acts constituted mere contact.

As in Green, the evidence presented at the trial was of penetration only. There was no evidence presented of mere contact. The defendant's theory at trial was to question the victim's credibility. The jury obviously credited the victim's testimony. Therefore, the trial court's failure to instruct on Class B misdemeanor assault did not affect the outcome of the trial and was harmless error.

For the reasons stated above, the trial court's failure to instruct on the enumerated lesser-included offenses is neither error nor harmless error.

### Sentence and Fines

At the conclusion of the defendant's trial, the jury recommended a fine of $50,000 for the rape convictions and $20,000 for the incest convictions. The trial court sentenced the defendant as a Range I Standard Offender to twelve (12) years on each rape conviction, to run concurrently, and three (3) years for each incest count to run concurrently to each other, but consecutively to the rape sentences. However, because there were multiple rape convictions, the defendant's release eligibility for the rape convictions is 100%. The trial court levied the full fines recommended by the jury.

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any

statements the defendant wishes to make on his own behalf about sentencing; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The defendant only presents an argument that the fines were excessive in this case. He presents no argument regarding the length of his sentence, nor does he cite any authority. For this reason, the defendant has waived the issue of his sentence in this appeal. See Tenn. Ct. Crim. App. R. 10(b).

We now turn to the issue of the fines levied by the trial court. When the jury returned from deliberations, the jury foreperson told the trial court that the jury had decided on a fine of $25,000 on rape and $10,000 on incest. The trial court and the State wanted clarification on how that sum applied to the two counts of each conviction. The jury foreperson then said the jury did not understand the fine structure and asked to return to the jury room. The trial court allowed the jury to return. The defendant objected to the jury retiring to reconsider the fines. The jury retired to the jury room for five (5) minutes. When they returned, they had decided upon $25,000 for each rape conviction and $10,000 for each incest conviction. At the sentencing hearing, the trial court levied fines of $25,000 for each rape conviction and $10,000 for each incest conviction, for a total of $70,000.

"When imposing sentence, after the sentencing hearing, the court shall impose a fine, if any, not to exceed the fine fixed by the jury." Tenn. Code Ann. § 40-35-301(b). Our supreme court has stated:

> The trial court's imposition of a fine, within the limits set by the jury, is to be based upon the factors provided by the 1989 Sentencing Act, which include "the defendant's ability to pay that fine, and other factors of judgment involved in setting the total sentence." State v. Marshall, 870 S.W.2d 532, 542 (Tenn. Crim. App. 1993). Trial and appellate courts must also consider other factors, including prior history, potential for rehabilitation, financial means, and mitigating and enhancing factors that are relevant to an appropriate, overall sentence. State v. Blevins, 968 S.W.2d 888, 895 (Tenn. Crim. App. 1997). The seriousness of a conviction offense may also support a punitive fine. State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996).

State v. Taylor, 70 S.W.3d 717, 723 (Tenn. 2002).

The defendant's argument on appeal is that he is indigent and unable to pay the fine. While he notes that the technical record does not include an affidavit of indigency, he asks us to take judicial notice of the fact that he was represented by the Public Defender and, thus, declared indigent. There are also no findings of fact by the trial court concerning the defendant's ability to pay.

-19-

Therefore, our review is de novo without a presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In State v. Alvarado, 961 S.W.2d 136 (Tenn. Crim. App. 1996), we faced a situation where the defendant claimed he was unable to pay the fine, which he claimed was excessive, imposed by the trial court. As in this case, there were no findings of fact by the trial court regarding the defendant's ability to pay. We did state that it was apparent from the record that the defendant was indigent. We then pointed out that, "[a] declaration of indigency, standing alone, does not, however, immunize the defendant from fines. It is merely one factor which may be taken into account." Alvarado, 961 S.W2d at 153.

In the case sub judice, we find evidence in the record that the defendant was indeed represented by the Public Defender at trial. However, as stated above, that is not the sole criteria for determining whether a fine is excessive. The defendant does have a prior criminal history. The trial court found no mitigating factors and four enhancing factors when sentencing the defendant including: (1) that the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (2) that the offense was committed to gratify the defendant's desire for pleasure or excitement; (3) that the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; and (4) that the defendant abused a position of private trust. See Tenn. Code Ann. §§ 40-35-114(1), (7), (8), (15). These enhancement factors are all amply supported by the record at hand, and furthermore, the defendant does not even contest their application.

We must also consider the seriousness of the offense. The defendant began having sexual intercourse with his daughter when she was thirteen (13) years old. She had recently moved to live with the defendant, leaving behind an unstable home life with her mother. The victim did not know the defendant very well at the time, but knew that he was her natural father. We cannot imagine a much more vulnerable state for a young girl. Then, the defendant continued to have sexual intercourse with the victim on a regular basis for five (5) years until she graduated from high school at the age of eighteen (18).

We find more than adequate support for the defendant's fines under the criteria set out in State v. Taylor, 70 S.W.3d 717 (Tenn. 2002). The trial court's imposition of the maximum fines of $25,000 for each rape conviction and $10,000 for each incest conviction for a total of $70,000 is proper. Therefore, this issue is without merit.

## Conclusion

For the foregoing reasons, we affirm the judgments of the trial court.

_____
JERRY L. SMITH, JUDGE